NORTHERN INDIANA PUBLIC SERVICE COMPANY, Petitioner–Appellee, Cross–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant, Cross–Appellee.

Nos. 96–1659, 96–1758.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 20, 1997.

Decided June 6, 1997.

507

Michael L. Brody, Lawrence H. Jacobson (argued), Schiff, Hardin & Waite, Chicago, IL, David C. Jensen, Eichhorn & Eichhorn, Hammond, IN, for Petitioner-Appellee.

Gary R. Allen, David E. Carmack, Edward T. Perelmuter (argued), Department of Justice, Tax Division, Appellate Section, Washington, DC, for Respondent-Appellee.

Before BAUER, WOOD, Jr., and COFFEY, Circuit Judges.

BAUER, Circuit Judge.

This appeal from the United States Tax Court requires us to examine whether interest payments on a note made by a domestic corporation to its wholly-owned Netherlands Antilles subsidiary are exempt from United States withholding tax, under the United States–Netherlands Income Tax Convention. The Tax Court determined that the payments fall within the ambit of the Convention and are exempt from United States taxation. We affirm.

## BACKGROUND

Northern Indiana Public Service Company ("Taxpayer") is a domestic public utility company. In 1981, Taxpayer formed a foreign subsidiary corporation, Northern Indiana Public Service Finance N.V. ("Finance"), in the Netherlands Antilles. Finance was organized for the purpose of obtaining funds so that Taxpayer could construct additions to its utility properties. To accomplish this, Finance issued notes in the Eurobond market and then lent the proceeds to Taxpayer.[1]

1. The Eurobond market was described in 1984 by the Senate Finance Committee as follows:
A major capital market outside the United States is the Eurobond market. It is not an organized exchange, but rather a network of underwriters and financial institutions that market bonds issued by private corporations (including but not limited to finance subsidiar-

Taxpayer's use of a Netherlands Antilles subsidiary to borrow funds in the European market was a financially-strategic measure. During the early 1980s, domestic interest rates hovered around twenty percent. To circumvent the high interest rates, United States companies turned to foreign investors. By using a Netherlands Antilles subsidiary to borrow funds in the European market, United States companies were able to obtain tax advantages not available through direct borrowing in that market. Section 1441 of the Internal Revenue Code generally requires a domestic taxpayer to withhold a thirty-percent tax on interest paid to nonresident aliens or foreign corporations. However, at the time the transactions in this case occurred, interest payments by a United States corporation to a Netherlands Antilles corporation were exempt from withholding tax pursuant to Article VIII of the United States–Netherlands Income Tax Convention ("the Treaty").

On October 15, 1981, Finance issued $70 million worth of notes in the Eurobond market ("the Euronotes"), at an annual interest rate of 17.25 percent. Taxpayer unconditionally guaranteed timely payment of the interest and principal on the Euronotes. Also on October 15, 1981, Taxpayer issued to Finance a $70 million note ("the Note"), bearing annual interest of 18.25 percent. In exchange, Finance remitted to Taxpayer $68,525,000– the net proceeds of the Euronote offering. The Euronotes and the Note had the same maturity date of October 15, 1988 and con-

tained the same early payment penalty provisions.

In 1982, 1983, 1984 and 1985, respectively, Finance received from Taxpayer interest payments of $12,775,000, which Finance deposited in its corporate bank account. In each of those years, Finance made interest payments of $12,075,000 to the Euronote holders. The spread created by this borrowing and lending yielded Finance an annual profit of $700,000 (an aggregate of $2,800,000 for the four years). Finance invested this income to earn additional interest income. Taxpayer did not withhold any United States tax on its payments to Finance.

On October 10, 1985, Taxpayer repaid the principal amount of the Note ($70 million), plus accrued interest ($12,775,000) and an early payment penalty ($1,050,000) to Finance. On October 15, 1985, Finance redeemed the Euronotes by repaying the principal ($70 million), together with accrued interest ($12,075,000), and an early payment penalty ($1,050,000). Finance was liquidated on September 22, 1986, and its assets were distributed to Taxpayer.

For each of the years in issue, Taxpayer filed Forms 1042 (United States Annual Return of Income Tax to be Paid at Source) and Forms 1042S (Foreign Person's United States Source Income Subject to Withholding). The interest payments made by Finance on the Euronotes were not reported on any of these forms, nor on any attached schedule or statement.

ies of U.S. companies), foreign governments and government agencies, and other borrowers.

In addition to individuals, purchasers of the bonds include institutions such as banks (frequently purchasing on behalf of investors with custodial accounts managed by the banks), investment companies, insurance companies, and pension funds.

STAFF OF SENATE COMM. ON FINANCE, 98TH CONG., 2D SESS., DEFICIT REDUCTION ACT OF 1984: EXPLANATION OF PROVISIONS APPROVED BY THE COMMITTEE 417 (Comm. Print 1984). In the early 1980s, United States corporations commonly sought access to the Eurobond market in the following manner:

U.S. corporations currently issue bonds in the Eurobond market free of U.S. withholding tax through the use of international finance subsidiaries, almost all of which are incorporated in the Netherlands Antilles.

Finance subsidiaries of U.S. corporations are usually paper corporations, often without employees or fixed assets, which are organized to make one or more offerings in the Eurobond market, with the proceeds to be relent to the U.S. parent or to domestic or foreign affiliates. The finance subsidiary's indebtedness to the foreign bondholders is guaranteed by the U.S. parent (or other affiliates). Alternatively, the subsidiary's indebtedness is secured by notes of the U.S. parent (or other affiliates) issued to the Antilles subsidiary in exchange for the loan proceeds of the bond issue. Under this arrangement, the U.S. parent (or other U.S. affiliate) receives the cash proceeds of the bond issue but pays the interest to the Antilles finance subsidiary rather than directly to the foreign bondholders.

*Id.* at 418.

On August 1, 1991, the Commissioner of Internal Revenue ("the Commissioner") issued a notice of deficiency to Taxpayer, claiming annual tax deficiencies of $3,785,250 for the taxable years 1982 through 1985. The notice stated:

> It has been determined that your 100% owned foreign subsidiary, incorporated in the Netherlands Antilles, was not properly capitalized, therefore the interest paid by that subsidiary on debt obligations (Euronotes) is treated as being paid directly by you. Consequently, you are liable for the 30% withholding which was not withheld on interest payments made to the holders of the Euronotes....

On October 25, 1991, Taxpayer filed a petition in the United States Tax Court contesting the Commissioner's deficiency determination based on the terms of the Treaty. In litigating the matter, the Commissioner took the position that the Treaty was inapplicable because Finance was a mere "conduit" or "agent" in the borrowing and interest paying process, and Taxpayer should be viewed as having paid interest directly to the Euronote holders.

In an opinion dated November 6, 1995, the Tax Court held that Taxpayer was not liable for the alleged deficiencies. The Tax Court determined that Finance was recognizable for tax purposes because it "engaged in the business activity of borrowing and lending money at a profit," and that, therefore, Taxpayer's interest payments to Finance fell within the terms of the Treaty and were exempt from United States taxation. The Commissioner appeals, and the question presented is whether the Tax Court erred by recognizing, for tax purposes, the transactions between Taxpayer and Finance. Taxpayer cross-appeals, arguing that the statute of limitations bars the assessment and collection of withholding tax for the taxable year 1982.

## ANALYSIS

Before delving into the merits of this appeal, we pause to review in greater detail the statutory backdrop against which the subject transactions were made. Sections 871 and 881 of the Internal Revenue Code generally impose a tax of thirty percent on interest income received by a nonresident alien or foreign corporation from sources within the United States. *See* I.R.C. §§ 871(a), 881(a).[2] United States sources who pay such interest generally are required to deduct and withhold a tax equal to thirty percent of the amounts they pay. *See* I.R.C. §§ 1441(a) and (b).[3] If they fail to do so, they are liable

---

2. **§ 871. Tax on nonresident alien individuals**

 **(a) Income not connected with United States business—30 percent tax.—**
 **(1) Income other than capital gains.—**Except as provided in subsection (h), there is hereby imposed for each taxable year a tax of 30 percent of the amount received from sources within the United States by a nonresident alien individual as—
 **(A)** interest (other than original issue discount as defined in section 1273), dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, and other fixed or determinable annual or periodical gains, profits, and income....
 **§ 881. Tax on income of foreign corporations not connected with United States business**
 **(a) Imposition of tax.—**Except as provided in subsection (c), there is hereby imposed for each taxable year a tax of 30 percent of the amount received from sources within the United States by a foreign corporation as—
 **(1)** interest (other than original issue discount as defined in section 1273), dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, and other fixed or determinable annual or periodical gains, profits, and income....

3. **§ 1441. Withholding of tax on nonresident aliens**

 **(a) General rule.—**Except as otherwise provided in subsection (c), all persons, in whatever capacity acting (including lessees or mortgagors of real or personal property, fiduciaries, employers, and all officers and employees of the United States) having the control, receipt, custody, disposal, or payment of any of the items of income specified in subsection (b) (to the extent that any of such items constitutes gross income from sources within the United States), of any nonresident alien individual or of any foreign partnership shall (except as otherwise provided in regulations prescribed by the Secretary under section 874) deduct and withhold from such items a tax equal to 30 percent thereof....
 **(b) Income items.—**The items of income referred to in subsection (a) are interest (other than original issue discount as defined in section 1273)....

for the withholding tax. *See* I.R.C. § 1461.[4] Under this statutory framework, Taxpayer would have been required to withhold tax on the interest it paid on the Note to Finance. (Alternatively, if Finance were disregarded and Taxpayer were deemed to have paid interest directly to the Euronote holders, Taxpayer would have been required to withhold tax on those interest payments.) However, the Code also provides that, to the extent required by any treaty obligation of the United States, income of any kind is exempt from taxation and excluded from gross income. *See* I.R.C. § 894.[5] During the tax years relevant to this appeal, Article VIII of the United States–Netherlands Income Tax Convention, as extended to the Netherlands Antilles, provided that "[i]nterest (on bonds, securities, notes, debentures, or on any other form of indebtedness), ... derived from sources within the United States by a resident or corporation of the Netherlands not engaged in trade or business in the United States through a permanent establishment shall be exempt from United States tax[.]" *See* Convention with Respect to Taxes on Income, Apr. 29, 1948, United States–Netherlands, 62 Stat. 1757, T.I.A.S. No. 1855 (extended to the Netherlands Antilles by Protocol, June 15, 1955, 6 U.S.T. 3696, T.I.A.S. No. 3366; amended by Protocol, Oct. 23, 1963, 15 U.S.T.1900, T.I.A.S. No. 5665; modified by Convention, Dec. 30, 1965, 17 U.S.T. 896, T.I.A.S. No. 6051).[6] Based on this provision, Taxpayer

did not withhold tax on its interest payments to Finance.

Under the terms of the Treaty, interest on a note that is "derived from" a United States corporation by a Netherlands corporation is exempt from United States taxation. The question presented to the Tax Court was whether Finance and its transactions with Taxpayer were recognizable for tax purposes, making Taxpayer's interest payments to Finance subject to the Treaty. The Tax Court determined that Taxpayer's interest payments should be recognized as having been paid to Finance, rather than directly to the Euronote holders. *Northern Ind. Pub. Serv. Co. v. Commissioner*, 105 T.C. 341, 1995 WL 649901 (1995). That being so, the payments to Finance fell within the terms of the Treaty, they were not taxable under §§ 871 or 881, and Taxpayer was not obligated to withhold tax pursuant to § 1441 or liable for failing to do so under § 1461.

■■■ Our review of decisions regarding the economic substance of transactions for federal income tax purposes is for clear error. *Yosha v. Commissioner*, 861 F.2d 494, 499 (7th Cir.1988). We may affirm the decision of the Tax Court on any grounds found in the record, regardless of the rationale relied upon below. *United States v. Flores–Sandoval*, 94 F.3d 346, 349 (7th Cir.1996) (citation omitted). At the outset, we acknowledge the need for liberal construction

---

**4. § 1461. Liability for withheld tax**

Every person required to deduct and withhold any tax under this chapter is hereby made liable for such tax and is hereby indemnified against the claims and demands of any person for the amount of any payments made in accordance with the provisions of this chapter.

**5. § 894. Income affected by treaty**

(a) **Treaty provisions.—**
(1) **In general.—**The provisions of this title shall be applied to any taxpayer with due regard to any treaty obligation of the United States which applies to such taxpayer.

6. In 1984, Congress eliminated the thirty-percent withholding tax on "portfolio interest" (including Eurobonds) received by a nonresident individual or foreign corporation from sources within the United States. *See* Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 127, 98 Stat. 494,

648 (1984) ("DEFRA"); *see also* I.R.C. §§ 871(h), 881(c), 1441(c)(9) and 1442. In so doing, it essentially provided United States taxpayers direct tax-free access to the Eurobond market and removed the major incentive for using Netherlands Antilles finance subsidiaries to issue Eurobonds. Although the amendments made by § 127 of DEFRA generally apply to interest received after the effective date of the Act (July 18, 1984), § 127(g)(3) established safe harbor rules applicable to certain controlled foreign corporations in existence on or before June 22, 1984. We need not determine whether the requirements of the safe harbor provisions were complied with in this case. As the Tax Court found, Congress did not intend § 127(g)(3) to be the exclusive means by which a taxpayer may claim exemption from the thirty-percent withholding tax. If we determine that the transactions between Taxpayer and Finance fall within the terms of the Treaty, Taxpayer will not be liable for the withholding tax, regardless of the safe harbor rules of DEFRA.

in determining the applicability of a given treaty. *See Aiken Indus., Inc. v. Commissioner,* 56 T.C. 925, 933, 1971 WL 2486 (1971) (citing *Jordan v. Tashiro,* 278 U.S. 123, 127, 49 S.Ct. 47, 48, 73 L.Ed. 214 (1928)).

The Commissioner has suggested that Taxpayer's tax-avoidance motive in creating Finance might provide one possible basis for disregarding the interest transactions between Taxpayer and Finance. The parties agree that Taxpayer formed Finance to access the Eurobond market because, in the early 1980s, prevailing market conditions made the overall cost of borrowing abroad less than the cost of borrowing domestically. It is also undisputed that Taxpayer structured its transactions with Finance in order to obtain a tax benefit-specifically, to avoid the thirty-percent withholding tax. What *is* in dispute is the legal significance of Taxpayer's tax-avoidance motive.

A tax-avoidance motive is not inherently fatal to a transaction. A taxpayer has a legal right to conduct his business so as to decrease (or altogether avoid) the amount of what otherwise would be his taxes. *Gregory v. Helvering,* 293 U.S. 465, 469, 55 S.Ct. 266, 267–68, 79 L.Ed. 596 (1935); *see also Yosha,* 861 F.2d at 497 ("There is no rule against taking advantage of opportunities created by Congress or the Treasury Department for beating taxes."); *Aiken Indus.,* 56 T.C. at 933 ("[T]he fact that the actions taken by the parties in this case were taken to minimize their tax burden may not by itself be utilized to deny a benefit to which the parties are otherwise entitled under the convention."); *Bass v. Commissioner,* 50 T.C. 595, 600, 1968 WL 1442 (1968) ("[A] taxpayer may adopt any form he desires for the conduct of his business, and . . . the chosen form cannot be ignored merely because it results in a tax saving."). However, the form the taxpayer chooses for conducting business that results in tax-avoidance "must be a viable business entity, that is, it must have been formed for a substantial business purpose or actually engage in substantive business activity." *Bass,* 50 T.C. at 600; *see also Yosha,* 861 F.2d at 497 ("[T]here is a doctrine that a transaction utterly devoid of economic substance will not be allowed to confer [a tax]

advantage."). This rule ensures that "what was done, apart from the tax motive, was the thing which the [treaty] intended." *Gregory,* 293 U.S at 469, 55 S.Ct. at 267.

The Tax Court relied on a line of cases for the principle that so long as a foreign subsidiary conducts substantive business activity— even minimal activity—the subsidiary will not be disregarded for federal tax purposes, notwithstanding the fact that the subsidiary was created with a view to reducing taxes. *See Moline Properties v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943); *Hospital Corp. of Am. v. Commissioner,* 81 T.C. 520, 1983 WL 14875 (1983); *Ross Glove Co. v. Commissioner,* 60 T.C. 569, 1973 WL 2626 (1973); *Bass v. Commissioner,* 50 T.C. 595, 1968 WL 1442 (1968); *Nat Harrison Assoc., Inc. v. Commissioner,* 42 T.C. 601, 1964 WL 1218 (1964). These cases involve domestic corporations which attempted to avoid taxes by creating subsidiaries—foreign subsidiaries in the majority of the cases— which conducted some transactions solely for tax-avoidance and other transactions which were not tax-motivated.

The Commissioner insists that these cases are inapposite to the present case because they involve the issue of whether income earned by a subsidiary should be allocated to its parent company on the ground that the subsidiary was a "sham." The Commissioner has abandoned any argument on appeal that Finance was a "conduit" or "agent" of Taxpayer. Those buzzwords which we generally use to describe a "sham" corporation are absent from the Commissioner's briefs. The Commissioner argues that it was error for the Tax Court to rely on the above-cited cases because the issue here is not whether Finance is properly characterized as a "sham," but, rather, whether the *transactions* between Finance and Taxpayer should be disregarded for tax purposes. The Commissioner urges that we look solely at the interest transactions between Taxpayer and Finance without concerning ourselves with Finance's legitimacy or its other economic activities.

To bolster her argument, the Commissioner cites *Knetsch v. United States,* 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960), and a

line of captive insurance company cases for the propositions that even legitimate corporations may engage in transactions lacking economic substance and that the Commissioner may disregard transactions between related legitimate corporations. *See Malone & Hyde, Inc. v. Commissioner,* 62 F.3d 835 (6th Cir.1995); *Gulf Oil Corp. v. Commissioner,* 914 F.2d 396 (3d Cir.1990); *Clougherty Packing Co. v. Commissioner,* 811 F.2d 1297 (9th Cir.1987); *Stearns–Roger Corp. v. United States,* 774 F.2d 414 (10th Cir.1985). In *Knetsch,* the taxpayer borrowed money at a certain interest rate and used the loan proceeds to buy an annuity bearing a lower interest rate. The transaction was unrelated to any business or other economic activity, but was designed solely to generate large interest deductions. The Supreme Court affirmed the Tax Court's denial of the taxpayer's claimed interest expense deduction for the transaction because the transaction did not engender "indebtedness" for federal tax purposes. In addition, in each of the captive insurance company cases cited by the Commissioner, claimed business expense deductions for purported insurance transactions between a parent corporation and its wholly-owned legitimate captive insurance subsidiary were denied on the ground that the transactions did not constitute "insurance" for federal tax purposes.

The Commissioner's argument is creative, but unpersuasive. Regardless of the words the Commissioner uses to make her argument, in substance, the Commissioner is asking us to disregard Finance and to deem the interest payments made by Taxpayer as having gone directly to the Euronote holders. We *are* looking at the interest transactions and not deciding whether Finance was a "sham." However, it is unnecessary, and we think inappropriate, for us to sever a corporation from its transactions in analyzing a case, such as this one, where the corporation was formed with the intent of structuring its economic transactions to take advantage of laws that afford tax savings. Finance's existence, its interest transactions with Taxpayer and its other economic activities are all relevant to our analysis. Moreover, *Knetsch* and the captive insurance company cases do not dictate the outcome the Commissioner de-

sires. Those cases allow the Commissioner to disregard transactions which are designed to manipulate the Tax Code so as to create artificial tax deductions. They do not allow the Commissioner to disregard economic transactions, such as the transactions in this case, which result in actual, non-tax-related changes in economic position.

 All of this is to say that the Tax Court was entitled to rely on *Moline Properties, Hospital Corp., Ross Glove, Bass* and *Nat Harrison.* These cases engender the principle that a corporation *and the form of its transactions* are recognizable for tax purposes, despite any tax-avoidance motive, so long as the corporation engages in *bona fide* economically-based business transactions. The Commissioner insists that Taxpayer cannot seek refuge in this maxim because Taxpayer's desire to avoid the thirty-percent withholding tax was its *sole* purpose in transacting business with Finance and because Finance engaged in no meaningful economic activity. We disagree. "Whether a corporation is carrying on sufficient business activity to require its recognition as a separate entity for tax purposes is a question of fact and [Taxpayer] had the burden of proof." *Bass,* 50 T.C. at 602. The Tax Court determined that Taxpayer met its burden, finding that "Finance engaged in the business activity of borrowing and lending money at a profit. . . ."

The Commissioner relies on two cases in its attempt to show that Finance engaged in no meaningful economic activity. The first is *Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935). *In Gregory,* the Supreme Court disregarded a corporation which was created for the sole purpose of receiving passive assets and distributing its stock in a purported reorganization. The corporation was liquidated six days after it was formed. The transaction was designed to take advantage of § 112 of the Revenue Act of 1928, a favorable reorganization provision of the tax laws. The Supreme Court ruled that the distribution was not made "in pursuance of a plan of reorganization," as the statute required, because it was "an operation having no business or corporate purpose. . . ." *Id.* at 469, 55 S.Ct. at 267. The

Court explained that the transfer of assets was:

> a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner. No doubt, a new and valid corporation was created. But that corporation was nothing more than a contrivance to the end last described. It was brought into existence for no other purpose; it performed, as it was intended from the beginning it should perform, no other function.... The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute.

*Id.* at 469–70, 55 S.Ct. at 267; *see also Yosha,* 861 F.2d at 498 (explaining that "reorganizations" like the one in *Gregory* "do not add to social wealth. They do not impinge on the world of business at all. They merely transfer wealth from one group of taxpayers to another.").

The second case the Commissioner relies on is *Aiken Industries, Inc. v. Commissioner,* 56 T.C. 925, 1971 WL 2486 (1971). In that case, a domestic corporation borrowed $2,250,000, at an interest rate of four percent, from a Bahamian corporation. The Bahamian corporation owned 99.997 percent of the domestic corporation's parent company, also a domestic corporation. The Bahamian corporation's wholly owned Ecuadorian subsidiary incorporated a company in the Republic of Honduras. The Bahamian corporation assigned the domestic corporation's note to the Honduran corporation in exchange for nine promissory notes ($250,000 each), which totaled $2,250,000 and bore interest of four percent. Because of this assignment, the domestic corporation made its four-percent interest payments to the Honduran corporation, which, in turn, made its four-percent interest payments to the Bahamian corporation. Prior to the assignment, the domestic corporation's interest payments to the Baha-

mian corporation would have been subject to the withholding provisions of § 1441 of the Internal Revenue Code. But after the assignment, because there was an income tax treaty between the United States and the Republic of Honduras, the domestic corporation claimed exemption from the withholding provisions. The Tax Court held that the corporate existence of the Honduran corporation could not be disregarded. It also held, however, that the interest payments in issue were not "received by" the Honduran corporation within the meaning of the United States–Honduras Income Tax Treaty, because the Honduran corporation lacked dominion and control over the interest payments.

From *Gregory* and *Aiken Industries,* we glean the following: Transactions involving a foreign corporation are to be disregarded for lack of meaningful economic activity if the corporation is merely transitory, engaging in absolutely no business activity for profit—in other words, it is a "mere skeleton." *See Bass,* 50 T.C. at 602 n. 3. Transactions will also be disregarded if the foreign corporation lacks dominion and control over the interest payments it collects.

In this case, Finance was set up to obtain capital at the lowest possible interest rates. Accessing the Eurobond market through a Netherlands Antilles subsidiary was not, at the time, an uncommon practice to accomplish this end. The record demonstrates that Finance "was managed as a viable concern, and not as simply a lifeless facade." *See id.* at 602. Finance conducted recognizable business activity—concededly minimal activity, but business activity nonetheless. Significantly, Finance derived a profit. It earned income on the spread between the interest rate it charged Taxpayer on the Note (18.25 percent) and the rate it paid to the Euronote holders (17.25 percent). The foreign corporation in *Aiken Industries* was held to lack dominion and control because, unlike Finance, it was literally a mere conduit, earning no profit on its borrowing and lending activities. The Tax Court stated in *Aiken Industries:*

> Industrias [the Honduran corporation] obtained exactly what it gave up in a dollar-

for-dollar exchange. Thus, it was committed to pay out exactly what it collected, and it made no profit on the [exchange of the notes].... In these circumstances, where the transfer of ... notes ... left Industrias with the same inflow and outflow of funds and where [the domestic corporation, the Bahamian corporation] and Industrias were all members of the same corporate family, we cannot find that this transaction had any valid economic or business purpose. Its only purpose was to obtain the benefits of the exemption established by the treaty for interest paid by a United States corporation to a Honduran corporation.

56 T.C. at 934. By contrast, Finance netted an annual $700,000 from its borrowing and lending activities. That income stream had economic substance to both Taxpayer and Finance. Each time Taxpayer made an interest payment to Finance, Taxpayer's economic resources were diminished while Finance's economic position was enhanced. Finance also reinvested the annual $700,000 interest income in order to generate additional interest income. Taxpayer had no control over Finance's reinvestments. Finally, the transactions in *Aiken Industries* were entirely between related parties. Finance, on the other hand, borrowed funds from unrelated third parties, the Euronote holders.

Relying again on *Knetsch,* the Commissioner argues that the income Finance earned on the transactions with Taxpayer is irrelevant; that a transaction does not necessarily have economic substance for tax purposes merely because one party profits from the arrangement. The Commissioner characterizes the one-percent profit Finance earned from the spread created by its borrowing and lending activities as a "fee" for accommodating Taxpayer in the Eurobond offering. The Commissioner's argument misses the mark. As we explained *supra,* the transaction in *Knetsch* was unrelated to *any* economic activity. The taxpayer paid money solely to obtain tax deductions and did not intend to profit in a true sense, as evidenced by the fact that the pre-tax interest outlay would be greater than the pre-tax interest received. Here, a profit motive existed from the start. Each time an interest transaction occurred, Finance made money and Taxpayer lost money. Moreover, Finance reinvested the annual $700,000 interest income it netted on the spread in order to generate additional interest income, and none of the profits from these reinvestments are related to Taxpayer.

 Looking at the record as a whole, we find that the Tax Court did not clearly err by determining that Finance carried on sufficient business activity so as to require recognition of its interest transactions with Taxpayer for tax purposes. That being so, it is unnecessary to address Taxpayer's cross-appeal. The judgment of the Tax Court is AFFIRMED.