# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2883

_____

Joseph P. McGraw,                           *
                                            *
            Appellant,                      *
                                            *   Appeal from the
      v.                                    *   United States Tax Court.
                                            *
Commissioner of Internal Revenue,           *
                                            *
            Appellee.                       *

_____

Submitted:  March 11, 2004
     Filed:  September 24, 2004

_____

Before MURPHY, SMITH, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

      Joseph McGraw appeals the decision of the United States Tax Court[1] finding
him liable for the tax deficiencies, including fraud penalties, of Metro Refuse, Inc.
("Metro") for tax years ending on June 30, 1988, 1989, and 1990.  We affirm.

_____

[1]The Honorable Maurice B. Foley, United States Tax Court Judge.

I.

Metro was a Minnesota corporation that provided waste disposal services to commercial customers in the Minneapolis-St. Paul area. William Butler was the founder of the company and its Chief Executive Officer and majority shareholder during the relevant time. Butler's job duties included business development, acquisitions, expansion planning, and assisting with the financial management of the business. Joseph McGraw started working as general manager for Metro in 1983. In 1988, McGraw became the president of Metro. Butler was the sole shareholder until McGraw bought 49 percent of Butler's Metro shares in June 1988. In both his general manager and president capacities, McGraw handled the day-to-day operations of Metro and served as its "chief financial person." Specifically, he supervised the accounting department and was personally responsible for maintaining the general ledger and preparing the balance sheets, income statements, and tax returns.

During the three taxable years in question (1988, 1989, and 1990), Metro engaged in two schemes that resulted in the omission of gross receipts from Metro's income tax returns and the taking of fictitious deductions. The first scheme ("Scheme I") involved Metro's provision of front-end loading services to Poor Richards, Inc., another waste-hauling service operated by Richard Wybierala. When Metro sent Poor Richards invoices for these services, Poor Richards issued checks payable to Metro or a defunct waste hauler called Village Sanitation, Inc. Wybierala, however, endorsed the checks using Butler's name and gave the cash directly to Butler. Over the three-year period, the checks issued as part of Scheme I totaled $609,895.52. Metro did not report the cash from Poor Richards as taxable income on its tax returns.

McGraw was aware that Metro's tax returns for the three-year period did not include any gross receipts for the subcontracting work it performed for Poor Richards. According to McGraw and Butler, however, the receipts were properly deductible from income by Metro as salary paid to Butler or business expenses of

Metro. They say that Poor Richards paid Butler in cash, so that Butler could receive additional compensation in order to avoid paying personal income taxes, and so he could pay for certain Metro wage, spare part, repair, and kickback expenses in cash. Despite their contention that the cash was used for Butler's salary and Metro business expenses, however, Metro did not report this compensation or these business expenses as deductions on its income tax filings.

The second scheme ("Scheme II"), which began in 1987, entailed Metro issuing checks to Poor Richards for non-existent subcontract work, and Wybierala of Poor Richards cashing the checks and giving the money to Butler. The amount of each transaction was always less than $10,000, which avoided federal reporting requirements. Again, Butler allegedly used the money to augment his personal income, to make kickback payments to a landfill employee, and to purchase items for Metro.

In 1988 and 1989, Scheme II resulted in Butler receiving $331,332. To carry out this scheme, McGraw created false vouchers, and the Metro accounts payable staff recorded the transactions as accounts payable. As a result, Metro reported these payments as deductible subcontract business expenses rather than as compensation to Butler. At the time of filing, McGraw was aware that Metro's tax returns for the 1988 and 1989 tax years overstated the amount of deductions for subcontracting expenses. For tax year 1990, the proceeds from Scheme II totaled $401,234. Instead of continuing to report this amount as a subcontracting service deduction, Metro claims that it consulted with legal counsel and reclassified $400,873 of these payments as a deduction for Butler's compensation.

In August 1990, Metro entered into an agreement with Browning Ferris Industries, Inc. ("BFI") in which all of Metro's assets were sold to BFI's Minnesota subsidiary ("BFIM"). In return, BFI assumed Metro's debt and transferred 212,233 shares of BFI stock to Metro. Metro and its stockholders (*i.e.*, Butler and McGraw)

-3-

agreed not to compete with BFI in the Twin Cities for a period of five years. On December 4, 1990, as part of its plan of liquidation, Metro distributed and re-issued the BFI stock to Butler and McGraw, who at that time owned 67 percent and 33 percent of Metro's shares, respectively. Accordingly, Butler received 141,488 shares and McGraw received 70,744. Metro filed its articles of dissolution on December 9, 1991.

According to McGraw, since Metro's dissolution, Butler and McGraw have paid other tax deficiencies and penalties owed by Metro. McGraw testified that in 1991 and 1992, Butler and McGraw paid the IRS and the Minnesota Department of Revenue for additional taxes, penalties, and interest that Metro owed for tax years 1988 through 1990. He averred that the total amount Butler and McGraw had to expend, including legal fees, was $538,883. Also, in 1995, Butler pled guilty to filing a false individual income tax return and aiding and abetting the filing of a false corporate tax return on behalf of Metro. As part of this plea agreement, Butler admitted filing false individual tax returns, and aiding and abetting the filing of false corporate tax returns for Metro, in 1988, 1989, and 1990.

On November 30, 1999, the Commissioner of Internal Revenue ("Commissioner") issued separate notices of tax liability to McGraw and Butler. The total liability alleged for tax deficiencies, fraud penalties, and interest was $1,946,292. McGraw and Butler filed petitions with the United States Tax Court challenging the Commissioner's notices of liability. In his amended answer, the Commissioner alleged an additional deficiency of $30,600 for the 1988 tax year, and asserted that the reclassified officer's compensation deduction taken in 1990 was also subject to the fraud penalty. McGraw and Butler contested the notices of liability in Tax Court.

After a two-day trial, the Tax Court issued a decision upholding the majority of the Commissioner's notices of liability, and finding that McGraw and Butler were jointly and severally liable for the following amounts:

| Year | Tax Deficiency | Fraud Penalty | Interest |
| --- | --- | --- | --- |
| 1988 | $112,324 | $83,393.24 and 50% of the interest due on $111,191 | plus interest on deficiency and fraud amounts |
| 1989 | $186,457 | $136,207.50 | plus interest on deficiency and fraud amounts |
| 1990 | $160,854 | $117,204 | plus interest on deficiency and fraud amounts |

McGraw raises numerous issues on appeal relating to the calculation of the tax deficiencies, the imposition of fraud penalties, the finding of transferee liability, and the total amount of transferee liability. We review the Tax Court's legal conclusions *de novo* and its factual findings for clear error. *Howard E. Clendenen, Inc. v. Comm'r*, 207 F.3d 1071, 1073 (8th Cir. 2000).

## II.

First, we consider whether the Tax Court erred in finding that Metro submitted fraudulent income tax returns for the tax years ending June 30, 1988, 1989, and 1990, and was thereby subject to fraud penalties pursuant to 26 U.S.C. § 6653(b)(1) (1988), 26 U.S.C. § 6653(b) (1989), and 26 U.S.C. § 6663 (1990). The finding of fraud is also pertinent to whether the Commissioner timely filed its notices of liability in 1999. *See* 26 U.S.C. § 6501(a), (c)(1) (a tax assessment cannot be imposed three

years after the return was filed unless it was a false or fraudulent return filed with the intent to evade tax). It is the Commissioner's burden to establish the taxpayer's fraud by clear and convincing evidence. *Id.* § 7454(a); *Scallen v. Comm'r*, 877 F.2d 1364, 1369 (8th Cir. 1989). The Tax Court's finding of fraud is an issue of fact, "which will be overturned only if it is not supported by substantial evidence on the record as a whole, or if it is clearly erroneous or induced by an erroneous view of the law." *Scallen*, 877 F.2d at 1369. We hold that the Tax Court's finding of fraud was not clearly erroneous.

## A.

Tax fraud is established when a taxpayer engages in intentional wrongdoing and has the "specific purpose to evade taxes the taxpayer knows or believes to be owing." *Day v. Comm'r*, 975 F.2d 534, 538 (8th Cir. 1992). McGraw claims that there was no evidence that Metro possessed the requisite specific intent to evade any income tax liability. Although Metro knew the tax returns were false because they omitted the Scheme I income and claimed the Scheme II deductions, McGraw argues that unclaimed deductions for additional compensation to Butler and his payment of kickbacks and business expenses from these funds undermine the Tax Court's finding that Metro intended to evade taxes.

Because fraudulent intent is rarely established by direct evidence, it may be established through circumstantial evidence. *Scallen*, 877 F.2d at 1370. Accordingly, we look for "badges of fraud" to determine whether there is substantial circumstantial evidence to support a finding of specific intent to evade taxes. *Id.* Such intent

> may be inferred from conduct such as keeping a double set of books, making false entries of alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records

-6-

usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal.

*Spies v. United States*, 317 U.S. 492, 499 (1942). Our court has said that a consistent pattern of sizeable underreporting of income, inadequate records, and unsatisfactory explanations for such underreporting also can establish fraud. *Scallen*, 877 F.2d at 1370; *Lessmann v. Comm'r*, 327 F.2d 990, 993-95 (8th Cir. 1964). In a case cited by McGraw, the Ninth Circuit also recognized failing to cooperate with tax authorities and using cash to avoid scrutiny of finances as additional "badges of fraud." *Bradford v. Comm'r*, 796 F.2d 303, 307-08 (9th Cir. 1986).

Upon review of the record, we find abundant circumstantial evidence supporting the Tax Court's finding of fraudulent intent. The amounts of money at issue are substantial: $544,505 of unreported income and $331,242 of fictitious deductions. Scheme I had begun by 1983 and involved the maintenance of a separate set of manually-created invoices, which were incomplete and deliberately excluded from Metro's computerized accounting system. Similarly, Scheme II involved the manipulation of Metro's accounting system for three years by creating false vouchers for the subcontracting work purportedly performed by Poor Richards and submitting those false vouchers to the accounts payable staff in order to deduct the phony costs. The transactions in both of these schemes involved exchanges of cash in amounts less than $10,000. *See* 26 U.S.C. § 6050I (a business is required to report to the federal government all transactions in excess of $10,000). Neither Butler nor McGraw informed the IRS or the Minnesota Department of Revenue about the underreporting of income or the overstatements of deductions during audits in 1990 and 1991. Specifically, Metro misrepresented to the Minnesota Department of Revenue that the deductions taken as a result of Scheme II were for "hauling" services.

Despite these badges of fraud, McGraw contends that Metro did not have the requisite specific intent to evade its taxes because the purpose of the omitted income

and false deductions was to evade Butler's personal income taxes, not Metro's corporate tax. This argument is unpersuasive; it actually supports a finding of fraudulent intent. A concession with regard to Butler's individual taxes is "pregnant with the admission" that Metro had a similar intention with respect to its own taxes. *See Koscove v. Comm'r*, 225 F.2d 85, 87 (10th Cir. 1955) (taxpayers' admission that their understatement of income was for the purpose of misleading local tax authorities and evading local taxes further supported a finding of fraud) (internal quotation omitted). Metro's intent to assist Butler in evading his personal income taxes, which necessarily involved deceiving government officials with regard to its own income, constitutes another "badge of fraud" supporting a finding of fraudulent intent. *See Hecht v. Comm'r*, 16 T.C. 981, 987 (1951) (finding fraud where taxpayer claimed he intended to deceive employer rather than IRS, but knew his actions would necessarily deceive government officials as well).

McGraw also contends that Metro's specific intent to evade its taxes was negated by its good faith belief -- whether objectively reasonable or not -- that any unreported income was offset by the deductions it did not take with regard to Butler's compensation. *See Cheek v. United States*, 498 U.S. 192, 202-03 (1991); 26 U.S.C. § 162(a)(1) (taxpayer entitled to reasonable deduction for compensation for services actually rendered). Before determining whether his belief was in good faith, it is necessary to determine whether the payments to Butler were even intended to be compensation. *Whitcomb v. Comm'r*, 733 F.2d 191, 193-94 (1st Cir. 1984) ("It is now settled law that only if payment is made with the intent to compensate is it deductible as compensation.") (internal quotation and citation omitted). We agree with the Tax Court that there was substantial evidence that Metro did not intend the payments to Butler to be additional compensation. Metro did not report any of the cash payments to Butler on its employment tax returns, withhold employment taxes, or issue a Form W-2 or Form 1099 with respect to the payments. Further, Butler used the payments to pay Metro's business expenses and kickbacks to a landfill owner, which is inconsistent with an inference that the money was personal compensation. Moreover,

there was no evidence that the amount Butler received from these schemes -- over $800,000 in 1988 and 1989 -- was reasonably related to his duties as an officer of the company, considering that he already received a reported compensation of approximately $600,000 per year. *See* 26 U.S.C. § 162 (a)(1) (allowance for salaries and compensation must be reasonable).

B.

Although the badges of fraud identified above continued into the 1990 tax year, McGraw contends that two additional circumstances negate a finding of fraud in that year. First, McGraw argues that the omission of income from Scheme I for tax year 1990, totaling $58,390, was inadvertent because McGraw believed the scheme had ended before the beginning of the 1990 tax year. The record reflects, however, that Scheme I ended in August 1989 -- the second month of the 1990 tax year -- when Poor Richards sold its routes to Metro. In view of the continued manipulation of Metro's accounting system, the substantial amount of money involved, and the use of cash transactions totaling less than $10,000, the Tax Court was not obligated to accept McGraw's denial of intent for the 1990 tax year. *See Paul E. Kummer Realty Co. v. Comm'r*, 511 F.2d 313, 315 (8th Cir. 1975) ("The Tax Court is the judge of the credibility of witnesses and is not compelled to accept the testimony of a witness even if it is not contradicted."). In addition, Butler admitted in his criminal plea agreement that during the 1990 tax year he "knew that the corporate tax returns were materially false in that the returns . . . omitted subcontracting income that was earned by the corporation." This is further evidence that at least one of the corporate officers of Metro had the specific intent to evade Metro's taxes in 1990. *See Ruidoso Racing Ass'n, Inc. v. Comm'r*, 476 F.2d 502, 505-06 (10th Cir. 1973) (fraud of CEO/majority shareholder could be imputed to corporation where it produced tax benefit for corporation). The Tax Court did not err in finding that the 1990 Scheme I income was subject to a fraud penalty.

Second, McGraw contends that in 1990, he relied on the advice of counsel regarding the reporting of the Scheme II subcontracting deductions, totaling $400,873. He claims that after consulting with counsel, he reclassified the subcontracting deductions as officer compensation deductions. According to McGraw, his reliance on the advice of counsel negates any intent he had to evade taxes in 1990, and Metro should not be subject to a fraud penalty. Good faith reliance on expert advice of a tax preparer (*i.e.*, an attorney or accountant) may be a defense to a tax evasion charge. *United States v. Meyer*, 808 F.2d 1304, 1306 (8th Cir. 1987). To establish this defense, however, the taxpayer must demonstrate that it provided the tax preparer with a "complete disclosure of all the relevant facts." *Id.*; *Scallen*, 877 F.2d at 1371.

We conclude that the Tax Court did not clearly err by refusing to credit McGraw's good faith reliance defense. There is little or no evidence that McGraw and Butler provided their tax advisors with all relevant information and documentation. Although McGraw testified that he had "many conversations" with his counsel about properly classifying deductions on Metro's 1990 tax return and told him about Schemes I and II, McGraw did not specify that he provided all relevant facts to his counsel. Specifically, there is no indication that McGraw told Metro's attorney about the lack of Forms W-2, Forms 1099, or board approval for Butler's alleged compensation, or that the funds paid to Butler were used to pay for Metro business expenses, including kickbacks. The attorney did not testify before the Tax Court. Based on the evidence presented to the Tax Court, it was not clearly erroneous for the Tax Court to find that McGraw did not fully disclose all necessary information to outside advisors. *See Meyer*, 808 F.2d at 1306.

### III.

McGraw raises several arguments challenging the Tax Court's calculation of the tax deficiencies for the three tax years in question. First, McGraw contends that

the Tax Court should have determined the amount paid in Scheme I by Poor Richards to Metro for the front-loading services by using Metro's invoices rather than Poor Richards' returned checks. The invoice total was $508,722, whereas the check total was $602,895. The Commissioner may use any method of computation that, in his opinion, clearly reflects the taxpayer's income in the absence of sufficient or reliable records. 26 U.S.C. § 446(b); *Rowell v. Comm'r*, 884 F.2d 1085, 1087 (8th Cir. 1999); *Day*, 975 F.2d at 537-38. The method of calculating the income is presumptively correct so long as it is rationally based. *Denison v. Comm'r*, 689 F.2d 771, 773 (8th Cir. 1982) (per curiam). If the method is reasonable, then the burden is on the taxpayer to show the determination is wrong. *Id.*

In this case, there was evidence that Metro's invoices did not provide a reliable basis to determine income. Several months of invoices were missing from the three-year period. There also was evidence that the invoices to Poor Richards were created manually by Metro employees rather than by the normal computerized method. The commissioner's method of using check receipts issued to Metro to establish the amount of Metro's income for the front-loading services is reasonable on its face. Scheme I was effectuated through the use of checks issued to Metro from Poor Richards. The checks are therefore a reliable indicator of the income Metro received from Scheme I. In response, McGraw failed to meet his burden to demonstrate that the Metro invoices are a better measure of money Butler received through Scheme I.

Second, McGraw argues that Metro is entitled to deduct the kickback payments Butler made to a landfill employee because they were "ordinary and necessary" business expenses under 26 U.S.C. § 162(a). With the cash Butler received as a result of Schemes I and II, he made cash payments to Robert Miller, the manager of Burnsville Sanitary Landfill, in exchange for lower dumping rates. McGraw had the burden to show that the kickback payments were deductible under § 162(a). *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992).

-11-

Relying on the definition of "ordinary" in *Deputy v. du Pont*, 308 U.S. 488, 495 (1940), and *United Draperies, Inc., v. Commissioner*, 340 F.2d 936, 937-938 (7th Cir. 1964), the Tax Court found that the kickback payments "were not 'normal, usual, or customary,' and the transactions which gave rise to these expenses were not 'of common or frequent occurrence in the type of business involved.'" (Add. 10). On that basis, it denied the deduction under § 162(a). There is some question whether the Tax Court employed the proper standard for "ordinary" expenses, given the Supreme Court's statement that "[t]he principal function of the term 'ordinary' in § 162(a) is to clarify the distinction, often difficult, between those expenses that are currently deductible and those that are in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset." *Comm'r v. Tellier*, 383 U.S. 687, 689-90 (1966); *see also Welch v. Helvering*, 290 U.S. 111, 115 (1933). Under this definition, kickbacks in some circumstances have been recognized as ordinary expenses eligible for deduction under 26 U.S.C. § 162(a). *Raymond Bertolini Truck. Co. v. Comm'r*, 736 F.2d 1120, 1123, 1125 (6th Cir. 1984). We need not resolve this question, however, because we conclude that the kickback payments were illegal, and thus cannot be deducted, even if they were "ordinary" expenses of the business.

Assuming McGraw established that the kickback payments were deductible as "ordinary" business expenses, the burden shifts to the Commissioner to establish that the kickbacks were illegal under federal or state law. *See* 26 U.S.C. § 162(c)(2). The Commissioner also must prove that the federal or state law is generally enforced. *Id.* The Minnesota commercial bribery statute provides that:

> **Subdivision 1: Definition.** "Corruptly" means that the actor intends the action to injure or defraud:
>
> . . .

(2) The employer or principal of the person to whom the actor offers, gives or agrees to give the bribe or from whom the actor requests, receives, or agrees to receive the bribe.

. . .

**Subdivision 2: Acts constituting.** Whoever does any of the following, when not consistent with usually accepted business practices, is guilty of commercial bribery and may be sentenced as provided in subdivision 3:

(1) corruptly offers, gives, or agrees to give, directly or indirectly, any benefit, consideration, compensation, or reward to any employee, agent or fiduciary of a person with the intent to influence the person's performance of duties as an employee, agent, or fiduciary in relation to the person's employer's or principal's business.

Minn. Stat. § 609.86. The Tax Court's holding that this state law is generally enforced was not clearly erroneous. At trial, an assistant county attorney testified that his office prosecuted individuals under the Minnesota commercial bribery statute, and there is no policy against enforcing the statute. This evidence was not controverted, and it is sufficient to support the Tax Court's finding on the general enforcement prong of § 162(c).

With regard to whether Butler's kickback payments satisfied the elements of the crime of commercial bribery, there was substantial evidence that Butler intended to influence Robert Miller, an employee of Burnsville Sanitary Landfill, by making cash payments to him so that Miller would give Metro lower dumping fees. Second, there was evidence that Butler intended to defraud Ed Kraemer & Sons, the owner of the landfill. Although Butler testified that he believed that making the cash payments to Bob Miller for a lower rate did not harm the owner, there was evidence that Butler knew Miller was keeping the money. Miller also testified that his retention of the cash payments resulted in a criminal conviction for not reporting the

-13-

payments on his personal income tax return. Further, the president and chief executive officer of Ed Kraemer & Sons since 1986, David Kraemer, testified that the company did not receive a portion of these payments, and he personally was not aware of the payments to Miller.[2]

Finally, the Tax Court's finding that such kickbacks were not consistent with "usually accepted business practices," Minn. Stat. § 609.86, subd. 2, was not clearly erroneous. The Tax Court concluded that "paying cash to landfill operators in exchange for lower dumping fees was not a common practice in the Twin Cities area, and other Burnsville customers did not make such payments." This finding is supported by the record. Robert Miller, the only landfill manager to testify, stated that the only waste-hauler from whom he received cash payments was Butler, and that such payments were not a common practice in the industry. Kraemer, the owner of the landfill, approximated that the landfill had well over 20 waste hauler customers, and perhaps as many as 50. In addition, Kraemer testified that he was not aware that kickbacks at landfills were a common industry practice. While McGraw and Butler sought to rebut this testimony with hearsay evidence and testimony from one of Butler's associates that Butler's practice of cash payments for lower fees was common in the industry, the Tax Court did not clearly err in resolving this dispute in favor of the Commissioner's position. In sum, even assuming Butler's payments to the landfill employee were a business expense under 26 U.S.C. § 162, they were illegal under Minnesota law, and Metro is therefore not entitled to a business expense deduction for the kickback payments to Miller.[3]

---

[2]McGraw contends that Kraemer's testimony should be discounted because the owner of the landfill lost his civil lawsuit against Butler and Wybierala on the ground that the owner "knew or should have known about the payments." The only evidence of record on the lawsuit, however, is Kraemer's testimony that "we lost the case on the statute of limitations point."

[3]McGraw's final contention regarding the calculation of his tax deficiencies is that the Commissioner overstated Metro's taxable income for its 1988, 1989, and

IV.

Next, we address whether McGraw is subject to transferee liability for Metro's tax deficiencies and fraud penalties because he was a recipient of Metro's remaining assets upon its dissolution in 1990. When a taxpayer such as Metro transfers its assets to its shareholders, leaving it unable to pay its federal taxes, the federal government may be able to collect those taxes from the shareholder pursuant to 26 U.S.C. § 6901. Section 6901 is merely procedural, however, and the existence and extent of a shareholder's liability is determined by state law. *Comm'r v. Stern*, 357 U.S. 39, 44-45 (1958). The Commissioner bears the burden to establish whether McGraw is liable as a transferee. 26 U.S.C. § 6902(a).

The Tax Court found McGraw and Butler liable as transferees for Metro's tax obligations pursuant to the Minnesota Uniform Fraudulent Transfer Act ("UFTA"), Minn. Stat. §§ 513.41 to 513.51, and the Minnesota Business Corporation Act ("MBCA"), Minn. Stat. § 302A.551, subd. 1. The UFTA provides that a transfer is fraudulent, and therefore voidable, when the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer, and the debtor was insolvent at the time or became insolvent as a result of the transfer. *Id.* §§ 513.45, 513.47. Under the MBCA section, a distribution to shareholders is illegal when it results in the corporation not being able "to pay its debts in the ordinary course of business." *Id.* § 302A.551, subd. 1. The Tax Court found that under either

1990 tax years because it was entitled to carry back a loss from 1992 when it paid outstanding Minnesota state taxes. *See* 26 U.S.C. § 164(a). The Tax Court did not address this issue, and we conclude that it is waived. Neither McGraw nor Butler discussed this issue in their post-trial briefs or during the trial. McGraw's pre-trial brief did list the issue of a loss carryback as an "issue" without any further discussion, but this passing reference is insufficient to preserve it for appeal where the Tax Court never ruled on the issue. *See Becker v. Univ. of Neb.*, 191 F.3d 904, 909 n.4 (8th Cir. 1999).

of these standards, McGraw and Butler were personally liable, because Metro's distribution of its BFI stock to them without consideration resulted in Metro's insolvency and its inability to pay tax deficiencies that McGraw and Butler knew to be owing.

McGraw asserts that it was error to base his liability on the UFTA in light of § 302A.551, subdivision 3(d) of the MBCA, which provides that the UFTA is inapplicable to corporate distributions made under § 302A.551. The Reporter's Notes to the MBCA indicate that the Legislature made the UFTA inapplicable because of concerns that the definition of "insolvency" in the UFTA's predecessor in Minnesota law (the Uniform Fraudulent Conveyance Act) may be inconsistent with the objective of § 302A.551 to judge a corporate director's actions under the business judgment rule. Minn. Stat. § 302A.551 (Reporter's Notes 1981). Under the Uniform Fraudulent Conveyances Act, the Reporter noted, the definition of insolvency may have required directors "to determine whether the present liquidation value of the corporation's existing assets will be sufficient to satisfy the corporation's existing obligations as they mature," rather than whether the corporation would be able to pay its debts in the usual course of business. *Id.* To ensure that directors were protected by the business judgment rule, the Reporter concluded, the Legislature wanted §§ 302A.557 and 302A.559 (rather than the Uniform Fraudulent Conveyances Act) to "define shareholder and director liability for any payment which would render the corporation insolvent." *Id.* When the Uniform Fraudulent Conveyances Act was replaced by the UFTA, the Legislature likewise made the UFTA inapplicable to corporate distributions under § 302A.551.

If only §§ 302A.557 and § 302A.559 define shareholder and director liability, however, then it is difficult to find in the text of those statutes a remedy for creditors. Unlike the UFTA, which establishes remedies for aggrieved creditors, Minn. Stat. § 513.47, the MCBA sections provide that a shareholder may be liable to "the corporation, its receiver, or other person winding up its affairs, or a director [as

provided in § 302A.559]."  Minn. Stat. § 302A.557, subd. 1.  To resolve this conundrum, Minnesota commentators have relied on the Reporter's Notes to conclude that § 302A.551, subd. 3(d) is designed only to relieve directors of personal liability where the definition of "insolvency" in the UFTA may conflict with the business judgment rule.  Thus, notwithstanding the plain language of § 302A.551, subd. 3(d), these commentators suggest that the UFTA "would be operative to recapture for the benefit of corporate creditors distributions improperly made but that directors, assuming compliance with Section 302A.551, would not themselves be rendered personally liable."  Steven J. Kirsch, 6 Minnesota Practice, Methods of Practice, § 17.2 (3d ed. 1990); *see also* John H. Matheson & Philip S. Garon, 18 Minnesota Practice, Corporation Law and Practice § 6.11 (2003).  We find it unnecessary to determine whether this analysis can be reconciled with the plain language of § 302A.551, subd. 3(d), because we ultimately agree with the Commissioner that McGraw is subject to transferee liability under Minn. Stat. § 302A.781.

Section 302A.781 provides that within one year after articles of dissolution have been filed, a creditor of the corporation "who shows good cause for not having previously filed the claim" may apply to a court in the state to allow a claim against a shareholder if the undistributed assets of the corporation are not sufficient to satisfy the claim.  Minn. Stat. § 302A.781, subd. 2(b).  The Reporter's Notes to the MBCA explain that the statute renders a shareholder personally liable for debts of the corporation in certain circumstances:

> Certain acts or failures to act, even if no other role [than shareholder] is assumed, will also lead to personal liability in varying degrees, for various claims, for various acts.  For example, . . . if the shareholder has received a distribution which violates section 302A.551 by rendering the corporation unable to pay its debts in the ordinary course of business, he or she is liable under section 302A.557, but only for the amount actually received that exceeds the amount that could have been received legally; *if the shareholder receives a distribution in dissolution, he or she is*

> *liable under section 302A.781, for any claims arising after the corporation is dissolved.*

Minn. Stat. § 302A.425 (Reporter's Notes 1981) (emphasis added). *See generally Niccum v. Hydra Tool Corp.*, 438 N.W.2d 96, 99 (Minn. 1989) (considering Reporter's Notes to determine intent of legislature); *Whetstone v. Hossfeld Mfg. Co.*, 457 N.W.2d 380, 383 (Minn. 1990) (same).

McGraw contends that this statute does not provide a basis for a transferee shareholder's liability, because it merely extends the time period within which a creditor may bring a claim. We disagree. The purpose of § 302A.781 is to establish a means by which a creditor can recover on claims against a dissolved corporation. As noted, the statutory comments provides that a shareholder is "liable *under* section 302A.781[,]" Minn. Stat. § 302A.425 (Reporter's Notes 1981), not, as McGraw suggests, under a different statute subject only to the timing provisions of § 302A.781. Other Reporter's Notes state that § 302A.781, subdivisions 2 and 3 "impose liability on certain individuals," *id.* § 302A.783 (Reporter's Notes 1981), thus providing further confirmation that the statute provides an independent basis for McGraw's transferee liability.

The IRS possessed a claim against Metro, a now-dissolved corporation, and under § 302A.781, the IRS may seek recovery on its claim from McGraw and Butler, the only shareholders of Metro. The Commissioner had good cause to file his claim after Metro's dissolution, because Metro's fraud deprived him of notice of the claim until after the dissolution. *See id.* § 302A.781 (Reporter's Notes 1981) ("Good cause . . . includes circumstances in which notice of the dissolution was not received by the person making the late claim, or where the claim did not arise until after the dissolution."). The one-year statute of limitations of § 302A.781, subdivision 2, does not bar the action against Metro's shareholders, because state statutes of limitations are inapplicable to the Commissioner in proceedings arising under 26 U.S.C. § 6901.

-18-

*See Phillips v. Comm'r*, 283 U.S. 589, 602-03 (1931). Accordingly, we hold that there is a proper basis under Minnesota law to hold McGraw, as a transferee of Metro's assets, personally liable to the IRS for Metro's outstanding tax deficiencies and penalties.[4]

V.

Finally, McGraw contends that the extent of his transferee liability should be reduced in a variety of ways. He argues that if the extent of his transferee liability is based on the value of the BFI shares that he and Butler received from Metro on December 4, 1990, then they are entitled to a discount in the value of the BFI shares due to the "restriction" on selling those shares for one year following the transfer. According to McGraw, if they had sold their shares within that time period, the tax-free nature of the reorganization plan would have disappeared, and Metro, Butler, and McGraw would have suffered grave tax consequences. The Commissioner responds that the extent of transferee liability should be the market value of the BFI stock on the day the shares were transferred to Butler and McGraw by Metro.

It is well-established that "where the question arises in litigation as to the value of property regularly traded in on [sic] an established market, the question merely is as to the price it commanded in the market at the particular time[.]" *Helvering v.*

---

[4]Although the Tax Court did not base its finding of transferee liability on § 302A.781, we may affirm its decision on any ground presented to it and supported by the record. *N. Ind. Pub. Serv. Co. v. Comm'r*, 115 F.3d 506, 510 (7th Cir. 1997); *Campbell v. Comm'r*, 943 F.2d 815, 818 (8th Cir. 1991). We believe that the Commissioner raised this ground in his post-trial brief to the Tax Court, which specifically argued that when the assets of a corporation are distributed to its shareholders, leaving corporate debts unpaid, shareholders are liable to a corporate creditor to the extent of the value of the assets received. (Comm'r Post-trial Br. at 26). Section 302A.781 is the means by which Minnesota law implements that well-established principle.

*Maytag,* 125 F.2d 55, 62 (8th Cir. 1942). We believe that principle governs here, and we reject McGraw's contention that this case fits within the exception addressed in *Stanko v. Comm'r*, 209 F.3d 1082, 1086-87 (8th Cir. 2000). In *Stanko*, the transferee was entitled to a discount because on the day she received the asset from the transferor, it was imbedded with deferred capital gains taxes that she would have to incur. *Id.* That is not the case here. The BFI shares transferred to Butler and McGraw from Metro did not contain any inherent restrictions or taxes that the transferees were required to pay or pass along to a buyer. McGraw and Butler were subject to taxes only if they sold the stock, while in *Stanko*, the transferee was forced to pay the taxes regardless whether she sold the asset. *Id.*

The value of the shares should be determined by what a willing buyer would pay for them at the time they were transferred. *Id*. at 1086. In this case, a willing buyer of the BFI shares would not have been subject to any additional taxes, and the resulting tax to the seller does not affect the value of the asset to a willing buyer. *Id.* Again, because there was no restriction on the transfer of the shares, no additional valuation was necessary. Accordingly, a share of BFI stock -- as valued by the New York Stock Exchange on December 4, 1990 -- was worth $21.875. Therefore, the value of McGraw's 70,744 shares was $1,547,525 and the value of Butler's 141,489 shares was $3,095,071.

McGraw next argues that the extent of his transferee liability should be reduced because he gave consideration for the BFI shares by agreeing not to compete with BFI for five years. This contention was not advanced in McGraw's pre-trial or post-trial briefs before the Tax Court, and he cites no other place in the record where it was properly raised. Therefore, the argument is waived. *See Minn. Lawyers Mut. Ins. Co. & Subsidiaries v. Comm'r*, 285 F.3d 1086, 1092 (8th Cir. 2002). In any event, this non-compete agreement was part of the reorganization between Metro and BFI, not Metro and its shareholders at the time of dissolution. Thus, McGraw has not

established that the covenant not to compete was in exchange for the BFI shares that Metro distributed to its shareholders.

McGraw's last argument is that his transferee liability should be reduced in light of payments that he and Butler made on behalf of Metro in 1991 and 1992. McGraw testified that in total, he and Butler paid $538,883, which included legal fees, to the IRS and the Minnesota Department of Revenue for changes made to Metro's tax returns for the 1988, 1989, and 1990 tax years. The Tax Court denied the request for a reduction in part on the ground that McGraw failed to establish the "particulars" of these payments. Although McGraw testified to the amounts that he and Butler allegedly paid, he did not substantiate these amounts with any documents, such as cancelled checks or completed tax forms. He even admitted that some of these expenses were paid from Metro's account, so it was not unreasonable for the Tax Court to expect some type of corroboration that McGraw paid these expenses himself before it credited his claim. We find no clear error in the Tax Court's conclusion on this point. *See Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

\* \* \*

For the foregoing reasons, we affirm the judgment of the Tax Court.
_____