T.C. Memo. 2018-212

UNITED STATES TAX COURT

RICHARD C. MATHEWS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 24673-14, 2939-15.　　　　Filed December 26, 2018.

Richard C. Mathews, pro se.

<u>William F. Castor</u> and <u>H. Elizabeth H. Downs</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  In these consolidated cases, respondent determined deficiencies and section 6663 civil fraud penalties for tax years 2007 and 2008 as follows:

[*2]

| Year | Deficiency | Civil fraud penalty[1] sec. 6663 |
|------|------------|-----------------------------------|
| 2007 | $6,556 | $4,917.00 |
| 2008 | 16,405 | 12,303.75 |

[1] In the deficiency notices respondent also determined that petitioner is liable for sec. 6662(a) accuracy-related penalties "if it is determined that any portion of the underpayment of tax is not due to fraud".

The issue for decision is whether petitioner, fraudulently and with the intent to evade tax, omitted income from his 2007 and 2008 Federal income tax returns. All section references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been deemed stipulated under Rule 91(f) and are so found. We incorporate the stipulation of facts and the attached exhibits by this reference. Petitioner resided in Arkansas when the petitions in these cases were filed.

Petitioner's Background

Petitioner dropped out of high school after completing the 10th grade. He then joined the U.S. Army and discovered he had a knack for computers. Using

[*3] his computer skills, petitioner helped conduct electronic surveillance for a military unit until he was honorably discharged in 1977.

Petitioner's Multilevel Marketing Business

In the late 1980s or early 1990s petitioner began participating in multilevel marketing, a sales strategy in which distributors recruit secondary distributors to sell products. See Signature Mgmt. Team, LLC v. Doe, 876 F.3d 831, 834 n.1 (6th Cir. 2017). Distributors earn money from direct sales to customers; they also receive revenue from sales made by the secondary distributors. Id. Doing business as Mathews Multi-Sales, petitioner participated in numerous multilevel marketing ventures over the years, selling coffee, vitamins, and other physical products.

Petitioner eventually shifted his multilevel marketing activity to the internet. Doing business as Mathews Multi-Service out of his home, petitioner operated several internet-based, multilevel marketing programs including Wealth Team International Association (WTIA), Fortune 5 Minutes, Glad Club, $20 Miracle, and It's No Miracle (collectively, Multi-Service programs). Under most of the Multi-Service programs, people would join with the intention of recruiting new members. If they were successful, they would receive a percentage of the membership fees paid by their recruits and the recruits of their recruits (and so

[*4] on).[1]  For example, WTIA had a membership fee of $99.  Of that $99, petitioner was required to "pay out" $90 to the member-recruiters.

Petitioner created accounts with several online payment systems to receive membership fees.  These online payment systems included Paypal, Storm Pay, Safepay Solutions, E-Bullion, E-Gold, and Internet Gold.

After receiving the membership fees in the online payment systems, petitioner remitted portions of the fees to the member-recruiters who were owed commissions.  Petitioner then moved some of the remaining funds to a joint checking account he held with his former wife, Donna Mathews (Mrs. Mathews).[2] He generally did so by depositing checks from the online payment systems.  For at least one of the online payment systems, petitioner also moved funds to his bank accounts via direct deposit.

Petitioner wanted to establish an international business presence for the Multi-Service programs.  He believed that being headquartered in the United States would limit his ability to do business worldwide.  Unsure how to operate

---

[1]  Members who joined the Multi-Service programs initially received software, but it is unclear what function the software served.  Respondent has not alleged that the Multi-Service programs violated Federal or State law.

[2]  Petitioner and Mrs. Mathews divorced on a date not established by the record.

**[\*5]** internationally, petitioner turned to the internet. His online research eventually led him to a Panamanian entity whose representatives advised him to establish a trust in Belize. Petitioner believed that the establishment of a trust in Belize would allow him to do business anywhere.

Accordingly, in September 2000 petitioner paid a fee and signed a trust instrument establishing the Centurion Trust. The trust instrument designated First Pacific Trust Services, Ltd., as the trustee and Mathews Multi-Service, petitioner, Mrs. Mathews, and their children as beneficiaries.[3] Petitioner never funded the Centurion Trust. Nor did he have the necessary education, experience, or acumen to understand how, if at all, the existence of the Centurion Trust could affect his Federal income tax liability. Petitioner has never visited Belize and does not have an office there.

---

[3] Paragraph 18 of the deemed stipulation of facts states: "Petitioner insisted [during respondent's civil examination of his 2005 return] that one of his businesses was actually the beneficiary of a trust in Belize, when in fact the true beneficiaries of the trust were relatives of petitioner." However, the trust document attached to the stipulation states that Mathews Multi-Service was the trust beneficiary "so long as he/she [sic] lives", after which time petitioner and his family would become beneficiaries. Under Rule 91(e), the Court may relieve parties of a stipulation if justice so requires. We will relieve petitioner of stipulated paragraph 18 because it is contrary to the record. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).

[*6] Petitioner's Tax Returns (2004, 2005, and 2006)

Using tax preparation software, petitioner prepared his and Mrs. Mathews' joint Federal income tax returns for tax years 2004, 2005, and 2006. Although he does not have bookkeeping, accounting, or taxation experience, petitioner thought he could "[just] buy the software, fill in the blanks, and file * * * [his] taxes." For 2004, 2005, and 2006, Mrs. Mathews received Forms W-2, Wage and Tax Statement, from her employer. Petitioner received Forms 1099-MISC, Miscellaneous Income, which reported commissions petitioner had earned selling physical products as Mathews Multi-Sales.

On their 2004 return, petitioner and Mrs. Mathews reported Mrs. Mathews' wage income. The 2004 return also included a Schedule C, Profit or Loss From Business, for petitioner reflecting the principal business as "networking" and the business name as "Mathews MultiSales". The 2004 Schedule C reported gross receipts of $3,560, cost of goods sold (COGS) of $900, gross profit of $2,660, no expenses, and net profit of $2,660. To calculate his gross receipts, petitioner used the amounts listed on Forms 1099-MISC he had received.

Petitioner and Mrs. Mathews reported Mrs. Mathews' wage income on their 2005 return. The return also included a Schedule C-EZ, Net Profit From Business, for petitioner reflecting the principal business as "networking" and the business

[*7] name as "Mathews MultiService". The 2005 Schedule C-EZ reported gross receipts of $3,318, no expenses, and net profit of $3,318. To calculate his gross receipts, petitioner used the amounts listed on Forms 1099-MISC he had received.[4]

On their 2006 return, petitioner and Mrs. Mathews reported Mrs. Mathews' wage income. The 2006 return did not include a Schedule C for petitioner and did not report business income or losses for either Mathews Multi-Sales or Mathews Multi-Service.

Petitioner believed that 90% of the funds he received through the Multi-Service programs belonged to the other member-recruiters. Petitioner also believed that he had deductible expenses with respect to the Multi-Service programs. On the basis of these beliefs, petitioner did not report any income from the Multi-Service programs on his 2004, 2005, and 2006 returns.

Civil Examination

In October 2007 respondent selected petitioner's 2005 return for examination. Revenue Agent (RA) Thurman Crawford was assigned to

---

[4] Because petitioner had earned the reported gross receipts as Mathews Multi-Sales, it appears that the reference to Mathews Multi-Service on the 2005 Schedule C was in error. Respondent has not alleged that petitioner's reference to Mathews Multi-Service was intended to confuse the Internal Revenue Service (IRS) or thwart a governmental investigation. Cf. Yu v. Commissioner, T.C. Memo. 1973-188 (holding that the use of an alias in conducting business affairs in order to thwart a governmental investigation is evidence of fraud).

[*8] petitioner's examination. Before his initial meeting with petitioner, RA Crawford visited WTIA's website.[5] A few things caught his eye.

For one, the website described WTIA as a compensation program. Second, the "Associate Terms & Conditions" page stated that the agreement was governed under the laws of Belize. On the basis of these discoveries, RA Crawford began to suspect that WTIA was: (1) a source of income to petitioner and (2) an offshore business designed to shield petitioner's income from Federal taxation.

On November 29, 2007, RA Crawford met with petitioner at his home. Over the next two days, RA Crawford interviewed petitioner, who admitted that his taxes were a "mess". RA Crawford asked petitioner about the nature of Mathews Multi-Service, which petitioner had reported as the business name on his 2005 Schedule C. Petitioner stated that the reference to Mathews Multi-Service was a mistake, that he had really meant his other business, Mathews Multi-Sales, and that the income reported on the Schedule C related to his coffee sales. Petitioner described Mathews Multi-Service as an online network-marketing business for which he wrote marketing material. Petitioner stated that he received no income from Mathews Multi-Service, that it was a beneficiary of a Belize Trust, and that "all taxes were handled in Belize."

---

[5] WTIA was the most prominent of the Multi-Service programs.

**[*9]** In response to a question about WTIA, petitioner stated that the program was part of Mathews Multi-Service. Petitioner also stated that WTIA used PayPal, Internet Gold, and Storm Pay in 2005 and that he had sole access to these online payment accounts. Petitioner admitted that he used some of the funds in the online payment accounts for personal or "other" expenses. He also stated that he could not recall whether funds were transferred from the Paypal account to bank accounts but that he never provided personal bank information to Paypal.

In an information document request issued to petitioner before the interview, RA Crawford had requested all bank statements, debit and credit memoranda, and canceled checks for all personal and business accounts from December 1, 2004, through January 31, 2006. On the first day of the interview, petitioner offered RA Crawford access to his online banking accounts. RA Crawford declined. The following day petitioner provided RA Crawford with paper statements for a joint account at First Security Bank, account number ending 6961 (FSB 6961 account).

RA Crawford scheduled a third meeting with petitioner for January 7, 2008. Before the meeting, RA Crawford reviewed petitioner's Paypal account records, which referenced an account at First Community Bank, account number ending 7186 (FCB 7186 account). At the January 7, 2008, meeting, RA Crawford asked

[*10] petitioner about this account. Petitioner told RA Crawford that First Community Bank had become First Security Bank, where he maintained his joint account with Mrs. Mathews. Petitioner did not immediately identify the FCB 7186 account as his and stated that he did not give online payment systems his personal bank account information. Later that afternoon, petitioner called RA Crawford and stated that he had spoken with a First Security Bank representative and now remembered that the FCB 7186 account was a closed Mathews Multi-Service bank account. RA Crawford believed that petitioner had deliberately concealed the account. He informed petitioner that the examination would be expanded to tax year 2006.

Sometime thereafter, petitioner asked to record all future meetings with RA Crawford. RA Crawford countered with an offer to redo and record the initial interview at the local IRS office; petitioner accepted. On February 22, 2008, RA Crawford interviewed petitioner, asking the same questions as in the initial interview. Petitioner provided many of the same answers during the second interview as the first interview. However, he provided different details about his role with WTIA.

RA Crawford also asked petitioner additional questions about the Centurion Trust. Petitioner stated that he learned about foreign trusts from the IRS, the

[*11] internet, law firms, and offshore businesses. Petitioner, however, did not identify who at the IRS had told him about foreign trusts. He also did not identify the law firm that purportedly created the trust. After the interview, RA Crawford noticed that the "Associate Terms & Conditions" on the WTIA website had been altered to reflect that WTIA was a subsidiary of the Centurion Trust.

In July 2008 RA Crawford expanded the examination to tax years 2003 and 2004 and scheduled another meeting with petitioner for early September. RA Crawford then met with a fraud technical adviser at the IRS. After this meeting, RA Crawford referred petitioner's case to respondent's Criminal Investigation Division (CID). Several days later petitioner left a message for RA Crawford asking whether "the 2005 year amount in dispute was down to zero". In a return phone call to petitioner, RA Crawford canceled the September meeting.

2007 Return

Petitioner prepared his 2007 return and filed it on October 15, 2008. In a break with past practice, petitioner and Mrs. Mathews filed separate returns. Petitioner's return included a Schedule C for "Centurion Trust/Mathews Multi-Service" with a principal business of "Online Admin/Facilitation/Consultation". The 2007 Schedule C reported gross receipts of $5,323, depreciation of $1,611, and net profit of $3,712.

**[*12]** CID's Initial Research and Search Warrant

In November 2008 CID accepted RA Crawford's referral. Special Agent (SA) Erica Williams was assigned as the lead special agent for CID's criminal investigation of petitioner. Through internet research and an undercover operation, SA Williams confirmed that petitioner was the owner of Mathews Multi-Service and that he received income from the Multi-Service programs. SA Williams found it significant that one of the program websites had a quotation from Al Capone, signaling to her that petitioner may have intended to evade tax.[6]

On the morning of July 21, 2009, CID executed a search warrant at petitioner's home. During the execution of the search warrant, petitioner agreed to submit to an interview with SA Williams.

In response to a question about his cash on hand, petitioner stated that he had $20 in his pocket but no other cash in his home. Later that morning, special agents uncovered two fire safes. One fire safe had $3,000 in cash and the other had $10,000. Petitioner stated that he had forgotten about the first fire safe and that he had never seen the second fire safe. When SA Williams threatened to

---

[6] Al Capone was convicted of tax evasion. See United States v. Ytem, 255 F.3d 394, 397 (7th Cir. 2001).

**[*13]** question Mrs. Mathews about the second fire safe, petitioner admitted that the $10,000 in the second safe was his.[7]

SA Williams asked petitioner about his online multilevel marketing business. Petitioner stated that he operated several programs under Mathews Multi-Service including WTIA, $20 Miracle, Fortune 5 Minutes, the Glad Club, and It's No Miracle. Petitioner explained that Mathews Multi-Service was the beneficiary of the Centurion Trust in Belize. He admitted that Mathews Multi-Service received funds through Paypal, E-Gold, Internet Gold, SafePay Solutions, and Storm Pay. Additionally, petitioner acknowledged that he had not reported income from WTIA on returns for at least 17 years but contended that the gross receipts from the Multi-Service programs were not his income. At another point in the interview, petitioner stated he did not know how to report income from the Multi-Service programs. When the civil examination came up, petitioner stated that RA Crawford had determined that his unreported income for all of the years under examination totaled $9,000. Petitioner also stated that RA Crawford had not yet taken deductions into consideration.

---

[7] It appears from the record that petitioner was fearful that the special agents would seize the cash. The special agents photographed the cash but allowed petitioner to keep it.

**[*14]** Responding to a question about the status of his 2008 Federal income tax return, petitioner stated that he had filed a request for an extension of time to file because he "didn't know what to do for his 2008 taxes".

2008 Return

Petitioner prepared his 2008 return and filed it on October 15, 2009. Petitioner and Mrs. Mathews again filed separate returns. Petitioner's return included a Schedule C for "Mathews Multi-Service" with a principal business of "internet advertising". The 2008 Schedule C reported gross receipts of $10,000 and no expenses. The $10,000 petitioner declared as income pertained to a Form 1099 he had received from I-Net Enterprises, which was neither owned by petitioner nor affiliated with Mathews Multi-Service. Thus, petitioner did not report any income from the Multi-Service programs on his 2008 Schedule C.

Petitioner attached to his 2008 return a typed statement, in which he wrote:

> I have prepared this 1040 to the best of my ability.
>
> In July of this year * * * [CID] took ALL my paperwork, financial statements, 1099s, receipts, credit card statements, bank statements, statements from charities, business expenses, receipts for business expenses and personal deductions, etc [sic], and even my tax preparation software disk! In other words, EVERYTHING I would need in order to file income taxes for the year 2008, leaving me with nothing!

>    *         *         *         *         *         *         *

[*15]     So, this is my very best effort to file this return from memory!

I know for a fact that I have other deductions, both for home office expenses, personal deductions, charitable contributions, and much more, but I do not have access to the records * * * [CID] took from my home and flatly refuse to return!

Therefore, I reserve the right to amend my returns, whenever the items are returned to me.

CID Additional Research and Bank Deposits Analysis

After the execution of the search warrant, SA Williams summoned petitioner's bank records for 2004 through 2008. Using the bank records, SA Williams performed a bank deposits analysis. SA Williams' analysis included only amounts received in petitioner's bank accounts; her analysis did not include amounts received in petitioner's online payment system accounts. SA Williams determined that petitioner had unreported gross receipts as follows:

| Year | Gross receipts per SA Williams | Gross receipts as reported | Unreported gross receipts |
|---|---|---|---|
| 2004 | $67,359.67 | $3,560 | $63,799.67 |
| 2005 | 39,179.32 | 3,318 | 35,861.32 |
| 2006 | 57,036.27 | --- | 57,036.27 |
| 2007 | 27,359.46 | 5,323 | 22,036.46 |
| 2008 | 54,365.70 | 10,000 | 44,365.70 |

In the course of her investigation, SA Williams suspected that petitioner was starting to withdraw cash from a business checking account at Centennial

[*16] Bank, account number ending 4175 (CB 4175 account), and deposit similar amounts of cash into the FSB 6961 account. Petitioner and Mrs. Mathews paid their living expenses out of the FSB 6961 account.

SA Williams also obtained a car loan application, dated May 23, 2008, signed by petitioner. Therein petitioner stated that he was employed by Mathews Multi-Service as a "network consultant" and that his "Gross Monthly Salary" was $3,600.

Criminal Prosecution

At the conclusion of the investigation, SA Williams referred petitioner's case to the U.S. Department of Justice (DOJ) with a recommendation to prosecute petitioner for tax evasion. The DOJ forwarded the case to the U.S. Attorney's Office in the Eastern District of Arkansas. On April 6, 2011, petitioner was indicted for tax evasion under section 7201 and subscribing to a false return under section 7206(1) for tax years 2004 through 2008.

After the indictment was issued, a new prosecutor took over the case and abandoned the tax evasion charges. In a superseding indictment, petitioner was charged with subscribing to false income tax returns under section 7206(1) for

[*17] 2004 through 2008.[8] Petitioner was also charged with impeding administration of the internal revenue laws under section 7212.

After a jury trial, petitioner was convicted of all charges in the superseding indictment and sentenced to a 27-month prison term. Petitioner appealed his conviction to the U.S. Court of Appeals for the Eighth Circuit. The Court of Appeals affirmed the District Court's criminal judgment in a published opinion. United States v. Mathews, 761 F.3d 891 (8th Cir. 2014).

Notices of Deficiency (2007 and 2008)

RA Crawford was assigned to respondent's civil examination of petitioner's 2007 and 2008 tax returns. After obtaining petitioner's bank statements and account statements from the online payment systems, RA Crawford determined that petitioner had gross receipts for 2007 as follows:

---

[8] SA Williams testified that the new prosecutor believed the sec. 7206(1) charges would make for a "cleaner case" than the sec. 7201 charges. As discussed infra, sec. 7206(1) does not require the Government to prove that the defendant intended to evade tax. See United States v. Tsanas, 572 F.2d 340, 343 (2d Cir. 1978); see also United States v. DiVarco, 484 F.2d 670, 673-674 (7th Cir. 1973); Siravo v. United States, 377 F.2d 469, 472 n.4 (1st Cir. 1967); Wright v. Commissioner, 84 T.C. 636, 643 (1985).

[*18]

| Account | Amount |
|---|---|
| Storm Pay, Inc. | $3,780.98 |
| FSB 6961 account | 79,155.12 |
| SafePay Solutions | 15,700.00 |
| E-Gold | 43,989.00 |
| CB 4175 account | 4,371.51 |
| Total deposits | 146,996.61 |
| | |
| Transfer from Safepay Solutions | [1](15,700.00) |
| | |
| Transfer from E-Gold | [2](7,270.52) |
| | |
| Nontaxable bank deposits | [3](56,842.17) |
| | |
| Total gross receipts | 67,183.92 |

[1] After determining that petitioner's Safepay Solutions deposits were transferred to petitioner's bank accounts, RA Crawford debited this amount to avoid double-counting income.

[2] After determining that some of petitioner's E-Gold deposits were transferred to petitioner's bank accounts, RA Crawford debited this amount to avoid double-counting income.

[3] This amount is the sum of Mrs. Mathews' deposited wage income and nontaxable deposits.

On the basis of this analysis, RA Crawford determined that petitioner had unreported gross receipts of $61,861, the difference between $67,184 and the gross receipts reported on petitioner's return. RA Crawford also identified a number of outgoing transfers from petitioner's accounts as potential business

[*19] expenses. RA Crawford characterized these expenses as cost of goods sold

(COGS) and determined that, for 2007, petitioner had COGS of $36,827.

For 2008 RA Crawford determined that petitioner had gross receipts as

follows:

| Account | Amount |
|---|---|
| E-Gold | $56,626.06 |
| CB 4175 account | 46,522.45 |
| Total | 103,148.51 |

On the basis of this analysis, RA Crawford determined that petitioner had

unreported gross receipts of $93,149, the difference between $103,149 and the

gross receipts reported on petitioner's return. As he did for 2007, RA Crawford

also identified a number of outgoing transfers from petitioner's accounts as

potential business expenses. RA Crawford characterized these expenses as COGS

and determined that, for 2008, petitioner had COGS of $39,062.

Respondent issued petitioner notices of deficiency for 2007 and 2008

reflecting these adjustments.[9] Respondent determined that petitioner was liable for

_____

[9] It is unclear from the record why respondent did not concurrently issue
notices of deficiency for tax years 2004, 2005, and 2006. On February 24, 2015,
petitioner sought redetermination of alleged deficiencies for 2003, 2004, 2005,
and 2006. See Mathews v. Commissioner, T.C. Dkt. No. 6799-15 (Nov. 17,
2015). In a motion to dismiss for lack of jurisdiction, respondent's counsel stated
(continued...)

[*20] fraud penalties for both years under section 6663. Respondent determined, in the alternative, that petitioner was liable for section 6662(a) accuracy-related penalties. Petitioner timely sought redetermination in this Court, and a trial was held in Little Rock, Arkansas.

OPINION

While petitioner does not dispute respondent's determinations that he had unreported income for 2007 and 2008, he argues that the periods of limitation have expired.[10] Petitioner also disputes the applicability of the section 6663 fraud penalties.

Section 6501(a) provides, generally, that the amount of any tax must be assessed within three years of the filing of a return. The notices of deficiency in these cases were issued more than three years after the relevant returns were filed. Therefore, the periods of limitation for the years in issue have expired and assessment is barred unless an exception to the general limitation period applies.

_____

[9](...continued)
that, as of June 19, 2015, no notices of deficiency for those years had been issued. The Court granted respondent's motion and dismissed the case for lack of jurisdiction.

[10] Petitioner raised the periods of limitation at the calendar call of the trial session, and respondent did not object. Accordingly, we find that the issue was tried by consent. See Rule 41(b).

**[*21]** Respondent relies on the section 6501(c)(1) fraud exception.[11] Under section 6501(c)(1), if a taxpayer files "a false or fraudulent return with the intent to evade tax, the tax may be assessed * * * at any time."

The Commissioner has the burden of proving exceptions to the general limitation period. See, e.g., Harlan v. Commissioner, 116 T.C. 31, 39 (2001). To satisfy his burden in these cases, respondent must show by clear and convincing evidence that: (1) an underpayment exists for each year and (2) petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Sec. 7454(a); Rule 142(b); Parks v. Commissioner, 94 T.C. 654, 660-661 (1990). This is the same as his burden under section 6663 to prove applicability of the civil fraud penalty (which is also at issue). See, e.g., Browning v. Commissioner, T.C. Memo. 2011-261, 2011 WL 5289636, at *10.

A.     Underpayment

Petitioner conceded that he underreported income for 2007 and 2008. We are satisfied that respondent has established by clear and convincing evidence an underpayment of tax by petitioner for each of the years in issue.

_____

[11] At trial respondent conceded that no other exceptions to the general limitation period apply for 2007 and 2008.

**[\*22]** B.      <u>Fraudulent Intent</u>

The second prong of the fraud test requires the Commissioner to prove that, for each year in issue, at least some portion of the taxpayer's underpayment of tax is due to fraud.  <u>See</u> <u>Parks v. Commissioner</u>, 94 T.C. at 661; <u>Butler v. Commissioner</u>, T.C. Memo. 2002-314, slip op. at 8, <u>aff'd sub nom.</u> <u>McGraw v. Commissioner</u>, 384 F.3d 965 (8th Cir. 2004).  Fraud for this purpose is defined as intentional wrongdoing, with the specific purpose of avoiding a tax believed to be owing.  <u>See, e.g.</u>, <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 874 (1991), <u>aff'd</u>, 959 F.2d 16 (2d Cir. 1992).  The Commissioner must therefore prove that the taxpayer intended to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of tax.  <u>See, e.g.</u>, <u>Browning v. Commissioner</u>, 2011 WL 5289636, at \*13.  Fraudulent intent must exist at the time the taxpayer files the return.  <u>Gleis v. Commissioner</u>, 24 T.C. 941, 952 (1955), <u>aff'd</u>, 245 F.2d 237 (6th Cir. 1957).  The existence of fraud is a question of fact to be resolved from the entire record.  <u>Gajewski v. Commissioner</u>, 67 T.C. 181, 199 (1976), <u>aff'd without published opinion</u>, 578 F.2d 1383 (8th Cir. 1978).  Because direct proof of a taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence and reasonable inferences may be drawn from the relevant facts.  <u>Spies v. United States</u>, 317 U.S. 492, 499 (1943); <u>Stephenson v.</u>

[*23] Commissioner, 79 T.C. 995, 1006 (1982), aff'd, 748 F.2d 331 (6th Cir. 1984). A taxpayer's entire course of conduct can be indicative of fraud. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). The sophistication, education, and intelligence of the taxpayer are relevant to determining fraudulent intent. See Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992); Stephenson v. Commissioner, 79 T.C. at 1006; Iley v. Commissioner, 19 T.C. 631, 635 (1952).

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent. These badges of fraud include: (1) understating income, (2) maintaining inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) an intent to mislead which may be inferred from a pattern of conduct, (8) lack of credibility of the taxpayer's testimony, (9) filing false documents, (10) failing to make estimated tax payments, and (11) dealing in cash. See Spies v. Commissioner, 317 U.S. at 499; McGraw v. Commissioner, 384 F.3d at 971; Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990); Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Although no single factor is necessarily sufficient to establish

[*24] fraud, the combination of a number of factors constitutes persuasive evidence. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), aff'g per curiam T.C. Memo. 1982-603; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989).

We find that respondent has failed to prove by clear and convincing evidence that petitioner had the specific intent to evade tax believed to be owing when he filed his 2007 and 2008 returns.

Before proceeding with our analysis, we will comment on the credibility of the parties' witnesses. "As a trier of fact, it is our duty to listen to the testimony, observe the demeanor of the witnesses, weigh the evidence, and determine what we believe." Kropp v. Commissioner, T.C. Memo. 2000-148, 2000 WL 472840, at *3. In Diaz v. Commissioner, 58 T.C. 560, 564 (1972), we observed that the process of distilling truth from the testimony of witnesses, whose demeanor we observe and whose credibility we evaluate, is the daily grist of judicial life. These statements regarding our role as a trier of fact are particularly apt here.

Petitioner lied on numerous occasions to RA Crawford and SA Williams during respondent's civil examination and criminal investigation. However, we do not believe he did so in this proceeding. Before trial, petitioner had served a substantial prison sentence stemming in large part from his behavior during the

[*25] audit and criminal investigation.  We believe this experience impressed upon petitioner the importance of telling the truth.  At trial petitioner admitted to making mistakes; he was respectful towards respondent and respondent's witnesses; and he was cooperative with the Court.  His testimony was convincing and withstood cross-examination.  We will therefore credit, as specified below, portions of petitioner's testimony.

RA Crawford and SA Williams also testified at trial.  We found each of them to be honest, forthright, and credible.  However, we disagree with their conclusions about petitioner's fraudulent intent.

Petitioner is not a sophisticated taxpayer or financially astute.  He dropped out of high school after the 10th grade and has no training or experience in bookkeeping, taxation, or accounting.  At trial he appeared confused about the nature of his tax liabilities and, at one point, credibly testified:  "[I]t's over my head."

Given petitioner's lack of sophistication, we question whether he knew there was a "tax owing" from the Multi-Service programs when he prepared his 2007 and 2008 returns.  Petitioner consistently maintained throughout trial that he "didn't know" how to report income from the Multi-Service programs.  This testimony is consistent with his statements to SA Williams during the July 2009

[*26] interview. Petitioner's testimony also accords with the general confusion petitioner expressed in the typed statement he attached to his 2008 return.

From the record, it appears that the source of petitioner's confusion was his belief that 90% of the funds he received through the Multi-Service programs belonged to the member-recruiters. Petitioner testified to this belief at trial, and SA Williams confirmed that the Multi-Service programs required payouts to its members.[12] The record also reflects that petitioner believed he had deductible expenses with respect to the Multi-Service programs.

Notes taken by RA Crawford and SA Williams during their respective investigations corroborate petitioner's confusion about the taxability of the Multi-Service program income. In an activity log dated August 21, 2008, RA Crawford described a voice message from petitioner in which petitioner asked whether "the 2005 year amount in dispute was down to zero". In a memorandum recounting the July 2009 interview, SA Williams noted petitioner's statement that, for all years under examination at the time (2004 through 2006), his total unreported income

---

[12] SA Williams testified: "Wealth Team International Association [WTIA], I believe, was maybe a $99 fee, one-time fee for one entry, and then once you * * * recruit others to join and you help them recruit, based on your level in the program, you would get payouts for * * * your efforts."

[*27] was no more than $9,000 before taking deductions into consideration.[13]  SA Williams also recounted petitioner's statement that he "didn't know what to do for his 2008 taxes".

It is respondent's burden to prove that petitioner underreported gross receipts on his 2007 and 2008 returns with the specific purpose of avoiding a tax "known to be owing".  See DiLeo v. Commissioner, 96 T.C. at 874.  Because petitioner has demonstrated genuine confusion about the calculation of his tax liabilities, respondent must negate the possibility that the underreporting was attributable to a misunderstanding.  See Cheek v. United States, 498 U.S. 192, 202 (1991); Niedringhaus v. Commissioner, 99 T.C. at 216-217; McCulley v. Commissioner, T.C. Memo. 1997-285.  The misunderstanding need not be objectively reasonable, though reasonableness may be relevant for purposes of assessing the credibility of the claim.  See Cheek, 498 U.S. at 202-204; Niedringhaus v. Commissioner, 99 T.C. at 216-217.

In these cases, the misunderstanding was petitioner's belief that his gross receipts from the Multi-Service programs did not generate tax liabilities because 90% was owed to other members and because he had other deductible expenses.

---

[13] SA Williams later determined that petitioner's unreported gross receipts for 2004, 2005, and 2006 totaled $156,697.26.

[*28] Having observed petitioner at trial, we find petitioner's misunderstanding credible in the light of his background and sophistication level. After a thorough review of the record, we also find that petitioner's misunderstanding was not corrected before he filed his 2007 and 2008 returns.[14]

To be sure, this is a close case. As the Court of Appeals for the Eighth Circuit observed in its opinion affirming petitioner's convictions under sections 7206(1) and 7212, petitioner's "reported gross receipts were a small fraction of the receipts deposited into his bank account." Mathews, 761 F.3d at 894. Furthermore:

> Mathews [petitioner] repeatedly lied to IRS agents during the audit. He failed to disclose one of his bank accounts and denied receiving compensation from one of his businesses. During the search of his home, he lied about the presence of $13,000 in cash. He was misleading and evasive about his business operations, continually changing key details about his role and the flow of funds. He claimed money from one of his businesses was actually income from a trust in Belize. * * * [Id. at 894-895.]

---

[14] At trial respondent introduced a March 2008 car loan application in which petitioner reported a monthly "Gross Salary" of $3,600 as evidence that petitioner knew his income from Mathews Multi-Service was taxable. However, it is unclear from the record what "Gross Salary" means in this context, as neither party contends petitioner was a salaried employee of Mathews Multi-Service. Given this gap in the record, we decline to draw any inferences from this document. Furthermore, if "Gross Salary" means "gross receipts", this document does not establish that petitioner knew he had positive net income from the Multi-Service programs.

**[\*29]** In many cases, these facts might support an inference that petitioner filed false and fraudulent returns with the intent to evade tax. See, e.g., Ruark v. Commissioner, 449 F.2d 311 (9th Cir. 1971) (holding that gross understatement of income, coupled with misstatements during audit, is a sufficient basis for a finding of fraud), aff'g per curiam T.C. Memo. 1969-48; Fuller v. Commissioner, T.C. Memo. 2007-62 (holding that understated income, overstated deductions, and failure to cooperate with the Commissioner justify a finding of fraud); see also sec. 6501(c)(1). However, the existence of fraud is a question of fact to be resolved from the entire record, Gajewski v. Commissioner, 67 T.C. at 199, and the sophistication, education, and intelligence of the taxpayer are relevant to determining fraudulent intent, see Niedringhaus v. Commissioner, 99 T.C. at 211; Stephenson v. Commissioner, 79 T.C. at 1006; Iley v. Commissioner, 19 T.C. at 635. Moreover, conduct of the taxpayer, even though reprehensible, will not justify a finding of fraud unless the fraudulent intent is shown to have existed when the return was made. Holmes v. Commissioner, T.C. Memo. 2012-251, at *37, aff'd, 593 F. App'x 693 (9th Cir. 2015); Barrier v. Commissioner, T.C. Memo. 1983-258; Semple v. Commissioner, a Memorandum Opinion of this Court dated Aug. 28, 1951, 1951 Tax Ct. Memo LEXIS 124, at *18.

**[\*30]** In these cases, the record establishes that petitioner was an unsophisticated taxpayer with little, if any, financial acumen. While petitioner behaved reprehensibly during respondent's civil examination and criminal investigation (which, for the most part, pertained to tax years not in issue), we believe he was genuinely confused about the taxability of the Multi-Service program income when he filed his 2007 and 2008 returns. See Cheek, 498 U.S. at 202-204. Accordingly, his misconduct during respondent's civil examination and criminal investigation does not establish that his 2007 and 2008 returns were fraudulent.

With respect to petitioner's criminal case, a section 7206(1) conviction does not collaterally estop a taxpayer from denying that his returns were fraudulent. Wright v. Commissioner, 84 T.C. 636 (1985); Wheadon v. Commissioner, T.C. Memo. 1992-633; Cox v. Commissioner, T.C. Memo. 1985-324. Under section 7206(1) it is a crime to willfully make and submit any return verified by a written declaration that is made under penalties of perjury which the taxpayer does not believe to be true and correct as to every material matter. The intent to evade taxes is not an element of the crime charged under section 7206(1), which "penalizes the filing of a false return even though the falsity would not produce tax consequences." United States v. Tsanas, 572 F.2d 340, 343 (2d Cir. 1978); see also United States v. DiVarco, 484 F.2d 670, 673-674 (7th Cir. 1973); Siravo v.

[*31] United States, 377 F.2d 469, 472 n.4 (1st Cir. 1967); Wright v. Commissioner, 84 T.C. at 643. Thus, although petitioner's conviction under section 7206(1) may be evidence of fraudulent intent, it does not establish as a matter of law that he intended to evade taxes. See Wright v. Commissioner, 84 T.C. at 643.

Having considered all of the facts and circumstances of these consolidated cases, we find that respondent failed to prove by clear and convincing evidence that petitioner filed false and fraudulent returns with the intent to evade tax for 2007 and 2008. We now address whether we will relieve petitioner of four stipulated paragraphs that say otherwise.

C.     Stipulated Paragraphs 63, 64, 65, and 66

Before trial and pursuant to Rule 91(f), we deemed stipulated, inter alia, paragraphs 63, 64, 65, and 66 after petitioner did not respond to our order to show cause why proposed facts and evidence should not be accepted as established. Paragraph 63 states that petitioner "fraudulently and with intent to evade tax, omitted income from his 2007 and 2008 income tax returns". Paragraph 64 states that the deficiencies in these cases "are due to petitioner's fraudulent intent to evade tax." Paragraphs 65 and 66 state that, for 2007 and 2008, petitioner is liable

**[\*32]** for deficiencies of $6,556 and $16,405, respectively, and for section 6663 penalties of $4,917 and $12,303.75, respectively.[15]

Generally, the Court "will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except * * * where justice requires", Rule 91(e), or "good cause is shown", Saigh v. Commissioner, 26 T.C. 171, 176 (1956); see also Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1547 (9th Cir. 1987) (stipulations should be enforced "unless manifest injustice would result"), aff'g T.C. Memo. 1986-23.  In deciding whether to allow a party to set aside or modify a stipulation, we look at factors such as inconvenience to the Court and possible injustice to the moving party if the stipulation were enforced.  Dorchester Indus. Inc. v. Commissioner, 108 T.C. 320, 334-335 (1997) (citing Adams v. Commissioner, 85 T.C. 359 , 375 (1985)), aff'd without published opinion, 208 F.3d 205 (3d Cir. 2000).

---

[15]  At the calendar call respondent's counsel stated that the deemed stipulation of facts "establishes both the deficiency and the civil fraud penalty in the case."  However, respondent's counsel also stated that respondent was prepared to try the case if the Court was not willing to determine deficiencies and civil fraud penalties on the basis of the stipulation.  The Court informed the parties that a trial would be necessary, and a full-day trial commenced later that week.

[*33] In the cases at bar, stipulated paragraphs 63 through 66 are legal conclusions and/or statements of ultimate fact[16] which we have found to be contrary to the record. If we enforced the deemed stipulated paragraphs against petitioner, we would effectively preclude him from contesting respondent's determinations. Because we doubt that petitioner filed false and fraudulent returns with the intent to evade tax for the years in issue, this result would be manifestly unjust. Accordingly, we will relieve petitioner of stipulated paragraphs 63, 64, 65, and 66.

D.    Conclusion

Having failed to establish by clear and convincing evidence that petitioner filed false and fraudulent returns with the intent to evade tax for 2007 and 2008, respondent is barred by the section 6501(a) limitations period from assessing deficiencies and alternative section 6662(a) accuracy-related penalties against petitioner for those years.[17] In reaching our decision, we have considered all

---

[16]  An ultimate fact generally refers to "a factual conclusion derived from intermediate facts." See Black's Law Dictionary 711 (10th ed. 2014).

[17]  After trial, respondent filed a motion to reopen the record to introduce evidence of compliance with the written supervisory approval requirement under sec. 6751(b). We will deny respondent's motion as moot.

**[*34]** arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant, moot or without merit.

To reflect the foregoing,

<u>An appropriate order will be issued, and decisions will be entered for petitioner.</u>